## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

UNITED STATES *ex rel.* GINA HEDSTROM,

STATE OF WISCONSIN, *ex. rel.* GINA
HEDSTROM,

STATE OF MINNESOTA, *ex. rel.* GINA
HEDSTROM,

        Plaintiffs,

v.

ADVANCED PAIN MANAGEMENT, S.C.;
CHICAGO GROWTH PARTNERS, LLC;
ADVANCED PAIN MANAGEMENT
HOLDINGS, INC.; ADVANCED PAIN
MANAGEMENT, LLC; APM WISCONSIN
MSO, LLC; ADVANCED BRACING PLUS,
LLC; and VISHAL R. LAL,

        Defendants.

Filed *In Camera and under seal*
pursuant to 31 U.S.C.§3730(b)(2)

RELATOR'S FIRST AMENDED
COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF UNDER 31
U.S.C. § 3730 FEDERAL FALSE
CLAIMS ACT, WISCONSIN STATE
FALSE CLAIMS ACTS, WIS. STAT. §
20.931, MINNESOTA FALSE
CLAIMS ACT, MINN. STAT. §15C.01

Jury Trial Demanded

---

## RELATOR'S FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF UNDER 31 U.S.C. § 3730 FALSE CLAIMS ACT

NOW COMES Gina Hedstrom Plaintiff/Relator, through her attorneys Cross Law Firm,

S.C., by Nola J. Hitchcock Cross, Mary C. Flanner, and Katherine Gaumond, and as and for a

complaint against Defendants, Advanced Pain Management, S.C.; Chicago Growth Partners,

LLC; Advanced Pain Management Holdings, Inc.; Advanced Pain Management, LLC; APM

Wisconsin, MSO LLC; Advanced Bracing Plus, LLC; and Vishal R. Lal, states as follows:

### I. INTRODUCTION

1.      Relator brings this action on behalf of the United States of America pursuant to the

False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), on behalf of the State of Wisconsin under

the False Claims for Medical Assistance Act, Wis. Stat. § 20.931 and on behalf of the State of Minnesota under the Minnesota False Claims Act, Minn. Stat. § 15C.01, *et. seq.* for claims submitted for payment through federal healthcare programs including Medicare and/or through Minnesota or Wisconsin healthcare programs, including Medicaid.

2.      This is an action for injunctive relief and to recover damages and civil penalties on behalf of the United States of America and the states of Wisconsin and Minnesota arising from false billing claims and false representations made or caused to be made to the United States and States of Wisconsin and Minnesota and their agents and intermediaries in violation of the aforementioned statutes.

## II. PARTIES

3.      Relator Gina Hedstrom is a citizen of the United States of America and a resident of the County of Milwaukee, State of Wisconsin. She is a Registered Nurse and, during the period October 31, 2012 to February 18, 2013, she was employed as Director of Practice Operations by Defendant Advanced Pain Management Holdings, Inc. through APM Wisconsin, MSO, LLC, per the 2012 IRS form W-2 for her employment.

4.      Defendant Advanced Pain Management, S.C. ("APM-SC") is a Wisconsin service corporation, with its principal place of business located at 4131 West Loomis Road, Suite 300, Greenfield, Wisconsin, 53221. Its Chief Medical Officer is Yogendra Bharat, M. D. It uses the same web site as "Advanced Pain Management" which markets APM-H and APM-SC.  APM-SC does business throughout the State of Wisconsin and in the City of Mankato in the State of Minnesota.

5.      Defendant Chicago Growth Partners, LLC is an Illinois limited liability company with its principal place of business located at 303 W. Madison Street, Suite 2500, Chicago, Illinois

2

60606. Chicago Growth Partners, LLC is a private equity firm that acquired all or part of Advanced Pain Management Holdings, Inc. ("APM-H") in December 2010.

6.    Defendant Advanced Pain Management Holdings, Inc. (APM-H) is a Delaware corporation that is not registered as a foreign entity authorized to do business in the State of Wisconsin. APM-H has its principal place of business and corporate offices located at 4131 West Loomis Road, Suite 300, Greenfield, Wisconsin, 53221. APM-H's Chief Executive Officer is Vishal R. Lal. It uses the same web site as "Advanced Pain Management" which markets APM-H and APM-SC and other APM entities. Its website lists 70 different names for its clinics and surgery sites. Many of the ASCs are identified by Pain Centers of Wisconsin and the name of a city and there are currently 13 such ASC's organized as Wisconsin limited liability companies. APM-H does business throughout the State of Wisconsin and in the City of Mankato in the State of Minnesota.

7.    Defendant Advanced Pain Management, LLC (APM-LLC) is a Delaware limited liability company. APM-LLC has its principal place of business and its corporate offices located at 4131 West Loomis Road, Suite 300, Greenfield, Wisconsin, 53221. It is not registered as a foreign entity authorized to do business in Wisconsin and is not registered as a Wisconsin limited liability company. It uses the same web site as "Advanced Pain Management," which also markets APM-H and APM-SC. APM-LLC does business throughout the State of Wisconsin and in the City of Mankato in the State of Minnesota.

8.    Defendant APM Wisconsin, MSO, LLC (APM-WI) is a Delaware limited liability company. It is registered as a foreign limited liability company authorized to do business in Wisconsin but it has failed to file the required annual reports in Wisconsin since 2010. The State of Wisconsin has noticed its intent to revoke APM-WI's authority to do business in the State of

3

Wisconsin APM-WI has its corporate offices located at 4131 West Loomis Road, Suite 300, Greenfield, Wisconsin, 53221. It uses the same web site as "Advanced Pain Management" which markets APM-H and APM-SC. APM-WI does business throughout the State of Wisconsin and in City of Mankato in the State of Minnesota.

9.     Defendant Advanced Bracing Plus, LLC (ABP-LLC) is registered as a Wisconsin limited liability company and lists its principal place of business at 5129 W. Franklin Dr. Suite 102 Franklin, WI 53132. ABP-LLC has its corporate offices located at 4131 West Loomis Road, Suite 300, Greenfield, Wisconsin, 53221. ABP-LLC does business throughout the State of Wisconsin and in the City of Mankato in the State of Minnesota.

10.     Except as necessary, hereafter APM-H, APM-SC, APM-LLC, APM-WI, Chicago Growth Partners, LLC, and ABP-LLC are collectively referred to as "APM", as they collectively use "Advanced Pain Management" without distinguishing designation on their combined website.

11.     Defendant Vishal R. Lal is an adult resident of Waukesha County, State of Wisconsin, City of Brookfield, residing at 4195 Chapel Hill Ct, Brookfield, WI 53045-7449 who has been at all times the Chief Executive Officer of Advanced Pain Management Holding, Inc. and Chief Executive Officer in fact of Advanced Pain Management, S.C. and the related APM entities including the ASCs, clinics, lab, and bracing distributor.

### III. JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this court for actions brought pursuant to 31 U.S.C. § 3730.

13.     This Court has jurisdiction over the Wisconsin law claims and jurisdiction over the Minnesota law claims pursuant to 28 U.S.C. §1367 and 31 U.S.C. §3732(b).

14.     The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because APM-H, APM-SC, APM-LLC. APM-WI and ABP-LLC all transact business in this district and Vishal R. Lal resides in this district. Chicago Growth Partners, LLC through APM-H transacts business in this district.

15.     Venue is proper in this Court pursuant to 31 U. S. C. §3732 because the Defendants during the relevant period are found, reside and/or transact business in this district and because the violations of 31 U. S. C. §3732(a) occurred within this judicial district

16.     Before filing the complaint, Relator's counsel met with the United States Department of Justice representative to provide information and notify the Department that Relator intended to file the prior complaint in this action. Relator's counsel also provided written notification of same to the Department.

17.     Relator submitted a Disclosure Statement to the United States Department of Justice with information and documentation in the possession of the Relator, supporting the allegations herein.

## IV. STATEMENT OF THE ACTION

18.     This action is brought on behalf of the State of Wisconsin, the State of Minnesota, and the United States of America to recover all damages, penalties and other remedies established by and pursuant to Wis. Stat. §20.931, Minn. Stat. § 15C.01, and the FCA, and as *qui tam* Plaintiff, Relator claims entitlement to a portion of any recovery obtained by the State of Wisconsin as authorized by Wis. Stat. § 20.931(11), any recovery obtained by the State of Minnesota as authorized by Minn. Stat. § 15C.13, and any recovery obtained by the United States of America as authorized by the FCA.

19.     Relator brings this action to impose liability upon Defendants for violations of Wis. Stat. § 20.931, Minn. Stat. § 15C.01, and the FCA and violations of various state and federal regulations by submission of false claims for monetary reimbursement to the State of Wisconsin, the State of Minnesota, and United States of America for the provision of health care services.

20.     Relator sets forth facts supporting allegations of false claims based on a business scheme providing illegal compensation and reward arrangements with physicians designed to alter medical judgment. Such scheme results in tainting the Medicare and Medicaid claims and rendering them false.

21.     Defendants' schemes pursue profit outcomes without regard to medical necessity and without regard to potential patient harm. Defendants' schemes include: 1) violations of the FCA and related Wisconsin and Minnesota statutes by billing for services that were not medically necessary, such as unnecessary urine drug screens and for unnecessary back braces and unnecessary services of mid-level healthcare providers; 2) intentional violations of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b) by offering, paying, soliciting or receiving something of value to induce or reward referrals; 3) intentional violations of the AKS by offering, paying, soliciting or receiving something of value to generate Federal and state health care program business; 4) intentional violations of AKS by routinely waiving co-pays for Medicare and Medicaid services without making an individual ability to pay determination; 5) intentional violations of the Stark Law, 42 U.S.C. § 1395nn by Advanced Pain Management S.C. making referrals of Medicare and Medicaid patients for designated health services to Advanced Pain Management Holdings, Inc. and its affiliated shell companies: Advanced Pain Management, LLC; APM Wisconsin, MSO, LLC; Advanced Bracing Plus, LLC; and Advanced Pain Management Lab, entities with which the physicians and Advanced Pain Management, S.C. have a financial relationship; 6) violations of the

6

Stark Law by APM and ABP-LLC entities by submitting claims to Medicare and Medicaid for those services resulting from prohibited referrals of designated health services from a physician; 7) falsification of documents submitted to induce government payments; 8) failure to advise patient beneficiaries of choice; 9) solicitation of beneficiaries to order to provide medical services, including medically unnecessary and potentially harmful medical procedures; 10) falsely certifying compliance with governing laws and regulations; 11) recommending expensive invasive surgical implants when less invasive measures were appropriate; and 12) conspiracy to cover-up false claims by creating sham corporations and phony business transactions to create a false appearance of separation and legitimacy.

22.     Relator also alleges that Defendants terminated her employment in retaliation against her for protected activity under the False Claims Act and in violation of Wisconsin's public policy.

## V. GENERAL FACTS

### A. Relator

23.     Relator Gina M. Hedstrom worked as Director of Practice Operations for Defendants Advanced Pain Management companies from October 31, 2012 until February 18, 2013.

24.     Hedstrom earned an Associate's Degree in Nursing from Milwaukee Area Technical College, a Bachelors of Science in Nursing from Cardinal Stritch University, and a Masters of Business Administration in Business from the University of Phoenix. She is currently enrolled in a Doctorate of Healthcare Administration program at the University of Phoenix. Relator is also a Certified Health Coach and a Certified Leadership Coach.

25.    Prior to Relator's first day of work on October 31, 2012, APM conducted five interviews with Hedstrom.  APM initially located Hedstrom through a personnel firm to which APM paid approximately $20,000 for referring Hedstrom.

26.    APM-LLC was the entity listed on the job announcement for Relator's position, Director of Practice Management.  APM-WI was the entity issuing paychecks to Relator.

27.    According to Relator's job description, her regular duties included "direct supervision, coaching and development" of both the "ASC and Practice supervision teams", giving her responsibilities over both the corporate side and the clinical physician practice side of the integrated operations. Also, as described in her job description and in practice, Relator's responsibility included: "Provide oversight and scheduling management to ensure minimal conflicts between APM and ASCs; Resolve scheduling conflicts between physicians, mid-levels and patients, ...."

28.    As part of Relator Hedstrom's regular duties, from October 31, 2012 until February 18, 2013, she participated at least weekly in Executive Committee meetings with CEO Vishal Lal, Chief Compliance Officer ("CCO") Dawn Krautkramer ("Krautkramer") and, until his termination in January 2013, with Chief Operating Officer Paul Nylander. She also met frequently with Gabriella Bauer ("Bauer"), Facility Ancillary/Services Manager, and, following Nylander's departure, also met regularly with Bauer and Tammie Valente, Patient Services Manager, who both then reported directly to Hedstrom.

29.    As the APM Director of Practice Operations, Relator Hedstrom's duties included reviewing and directing operations of the Advanced Pain Management throughout the State of Wisconsin and in Mankato, Minnesota.

30.    Relator Hedstrom has personal knowledge regarding all aspects of Defendants'

8

operations and schemes at the corporate and practice operation level obtained through her regular duties and responsibilities. Hedstrom has personal knowledge of Defendants' clinical operations and procedures throughout Wisconsin and in Mankato, Minnesota.

31.     Hedstrom had access to Defendants' software and databases as part of her regular duties.

32.     Relator passed her probationary period on February 1, 2013 due to exemplary performance.During the period February 2, 2013 through February 18, 2013, Relator engaged in protected conduct in furtherance of an FCA claim and to contest and stop APM's false claims against the United States, Wisconsin and Minnesota. She had many extended conversations with Krautkramer and several with Lal protesting APM's business methods that were in violation of government regulations, including that APM was committing fraud when it billed the government for new braces when patients were instead issued used braces and when it failed to issue refunds to the government when patients returned the braces. She worked in furtherance of an FCA action and attempted to stop false claims against the United States, Wisconsin and Minnesota with regard to the APM incentives paid to staff for braces, prescriptions for medically unnecessary braces for patients who did not need them and ordering medically unnecessary urine screens. Relator Hedstrom engaged in conduct in furtherance of an FCA claim and to contest and stop Stark Act violations, fraudulent scheduling practices, including the incentives APM paid to staff for scheduling patient procedures and APM's practice of creating "dummy" schedules and billing the government for medically unnecessary patient procedures and billing for procedures as if they had been performed by providers with enhanced qualifications. She also engaged in conduct in furtherance of an FCA claim and to stop false claims related to APM's waiver of co-pays without a

9

determination of the patient's ability to pay in order to induce patients to consent to additional medical services which were ultimately billed to the government.

33.     In February, 2013, in response to Relator Hedstrom's furtherance of an FCA claim and her attempts to stop false claims, including those set forth in paragraph 33 above, Krautkramer told Hedstrom that APM was not going to do anything to stop the false claims. When Hedstrom made subsequent attempts to stop the fraud, Krautkramer reminded Hedstrom that Krautkramer had already told Hedstrom that APM was not going to cease the conduct to which Hedstrom objected or to cease submitted such false claims. "

34.     In February 2013, Lal called Hedstrom and asked if she had any concerns. Hedstrom responded in furtherance of an FCA and to stop false claims by informing Lal about the concerns she had about fraud. That night, Krautkramer called Hedstrom and referenced Hedstrom's earlier conversation with Lal regarding Hedstrom's opposition to fraud. Krautkramer informed Hedstrom that Krautkramer could make sure Hedstrom was not working at APM.     These conversations occurred just days before APM terminated Hedstrom.

35.     APM-H/APM abruptly terminated Relator on February 18, 2013 in a letter stating that "APM does not feel that your skills and abilities are a fit for your current position as Director of Practice Operations."

**B. Defendants**

36.     According to its website, APM began in 1998 by founder Bhupinder Saini, M.D. and identifies the entity as "Advanced Pain Management, LLC."

37.     In all of its promotional materials, correspondence, and generally, the four corporate Defendants: APM-H; APM-LLC; APM-WI; and APM-S.C. refer to themselves jointly as

"Advanced Pain Management" without differentiation among the corporate entities or the affiliated shell corporations.

38.    APM-H/APM-LLC/APM-WI/APM-SC operate as a single entity based on an integrated physician/ambulatory surgical center model.

39.    APM-H/APM-LLC/APM-WI/APM-SC have a common website: www.apmhealth.com , Facebook page, and Twitter feed.

40.    Currently, after just 15 years in existence, Advanced Pain Management has become the largest or one of the largest pain management groups in the entire United States, offering a broad array of pain management treatments administered throughout its 30 clinics/ambulatory surgical centers in Wisconsin and one clinic/ambulatory surgical center in Mankato, Minnesota. Some of its facilities operate within hospitals with which they have joint venture ownership arrangements.

41.    APM's business plan called for opening of nine (9) additional facilities in Wisconsin in 2013 with written plans for expanding throughout the United States through spreading its business model.

42.    In its Strategic Plan, APM states as one of its "value propositions": "Multi-State Company utilizing an integrated physician/asc model." Another of APM's "value propositions" is "Offering complimentary services with preferred partners that improve the quality of care for our patients."

43.    APM-H maintains a financial relationship with the physicians in APM-SC, including, but not limited to, direct or indirect bonus compensation to the physicians. The compensation is not set in advance, but determined on the basis of the volume or value of the referrals and other business generated between the parties.

44.     APM advertises that it offers the following procedures and programs: Treatment Options: Celiac Plexus Block, Cervical Epidural Steroid Injection, Discogram, Electromyogram (EMG), Epidural Steroid Injection, Epidural Blood Patch, Facet Joint Injection, Ganglion Impar Injection, Ilioinguinal Injection, Hypertonic Saline Injection, Hypogastric Plexus Block, Intercostal Nerve Block, Intradiscal Electrothermal Therapy (IDET), Intrathecal Pump Implant, Intravenous Lidocaine Infusion, Joint Injections, Lateral Femoral Cutaneous Nerve Injection, Lumbar Epidural Steroid Injection, Lumbar Sympathetic Nerve Block, Medication Management, Neurostimulation Therapy, Occipital Nerve Block, Radiofrequency Neuro Ablation, Sacroiliac Joint Injection, Selective Nerve Root Block, Stellate Ganglion Injection, Thoracic Epidural Steroid Injection Preop, Trigger Point Injections, Vertebroplasty, Bracing Services, and Lab Services.

45.     The Defendant corporations have entered into provider agreements for Medicaid and Medicare and other related programs which provide, as a condition to receive payment from the federal, Wisconsin and Minnesota governments, that Defendants shall comply with all Federal and State laws pertinent to the Medicare and Wisconsin and Minnesota Medicaid Programs, including Medicare and Medicaid's official handbooks and other publications.

46.     Government payments from the federal government or the states of Wisconsin and Minnesota account for about one-half of Defendants' revenue. In 2012 government payments were the source of approximately 45% of Defendant' revenue.

47.     APM sometimes submits billing using its corporate address and TIN number and many other times uses the address of the particular clinic or ASC where the service was provided and uses provider numbers associated with that address.

## VI. DEFENDANTS' FRAUDULENT CONDUCT

12

## A. Single Operation of Multiple Legal Entities Designed for Maximum Billing & to Evade Legal Prohibitions Against Kickbacks/Referrals

48.     Defendants are technically distinguished in that Advanced Pain Management Holdings, Inc. owns and operates the Ambulatory Surgical Centers ("ASCs"). Each ASC location is set up as a separate entity. APM-H has a relationship over Advanced Pain Management, S.C., which operates the Advanced Pain Management clinics, which directly provide healthcare and related services and each location is set up as a separate entity. In fact, the two main entities, APM-H and APM-SC and all their related entities, which also include Advanced Pain Management, LLC; APM Wisconsin MSO, LLC; all the Pain Centers set up as separate LLC's, Advanced Pain Management Lab and Advanced Bracing Plus, LLC operate as a single operational entity, led by Vishal Lal.

49.     Dr. Yogendra Barat, of the Racine corporate affiliate, is APM's Medical Director and Chief Medical Officer. He has an ownership interest in both APM-SC and APM-H as do three other physicians associated with APM: Doctors Thomas Stauss, Bhupinder Saini, and Dermot More-O'Ferrall, (collectively "four founders" or "partner physicians").

50.     Vishal Lal, the Chief Executive Officer and primary owner of APM-H in addition to the private equity group described above, directs all aspects of all the APM entities and their related lab and brace entities. Such control includes, but is not limited to, scheduling medical services and thereby determining the priority of healthcare delivery to patients including intentional delay of follow-up appointments to accommodate new patients who have higher payment rates, determining factors for payment of bonuses to the healthcare providers and staff, disciplining physicians, mid-levels and staff who do not perform in a manner that produces the highest level of profit without regard to medical necessity or patient harm. APM, through Lal and those he directs, pressures physicians to perform procedures to meet monthly revenue goals without

13

regard to medical necessity. Unnecessary procedures result in patients being subject to highly painful experiences, including invasive testing, unnecessary surgeries, and extreme physical manipulations with the risk of severe injury, including paraplegia, and death.

51.     During and as part of Relator's orientation in November 2012, Defendants' Controller, Rachael Sprung, explained to Relator that the legal structure of the APM entities is set up solely to avoid Stark Law violations, but that in actual operation, all of the APM entities operate as one, with Vishal Lal directing the entire operation. In January 2013, during a meeting regarding practice operations, Krautkramer reminded Relator that the entities operate as one in all respects in actual operation.

52.     According to a chart dated August 8, 2012 titled "Management Org Structure" and, in fact, in practice, APM-H also handles and oversees the following functions for all Advanced Pain Management entities: 1) billing and submitting claims for government payment in conjunction with its on-site vendor, National Billing Services, Inc.; 2) human resources and payroll; 3) treasury management, accounting, and financial reporting; 4) bonuses and discipline for reasons related to volume and revenue; 5) risk management, quality assurance, and clinical compliance; 6) business development and branding for "Advanced Pain Management"; 7) site management, including negotiating business arrangements for the 30 branch clinics in Wisconsin and one in Mankato, MN; 8) practice operations and patient services; and 9) information technology, including selecting and programming software and developing drop-down codes and narratives.

53.     According to the "Management Org Structure", APM-SC, consists of a governing Medical Committee over "Physicians and Clinical/Medical Staff" and no other personnel or departments whatsoever except for a dotted line to the Chief Medical Officer, Dr. Bharat, who, in turn, has a solid line relationship to Vishal Lal, CEO of APM-H.

54.     APM-H also operates, directs and owns Advanced Pain Management Lab and Advanced Bracing Plus, LLC, both addressed below.

55.     In order to maintain the fiction of separate entities, APM-H directs patients to come into different parts of the same facilities. If a patient has a clinic appointment and will have an injection that could be performed in the clinic setting, to increase revenue Lal directs the APM-SC staff and physician to walk the patient out of the APM-SC clinic and into adjoining Ambulatory Surgical Center ("ASC") owned by APM-H so that the injection is performed in the ASC and not the clinic. APM then bills an ASC facility charge as if use of the ASC facility is medically unnecessary. Patients are required to have their credit cards run twice so that the payments are separated for billing between the clinic and ASC and APM runs a journal entry to transfer some funds of the payment to the other entity. ASC and the clinic use the same clinical staff and the same staff to process the payments, direct, and approve the billing, and submit claims to the states of Wisconsin and Minnesota and to the United States. The same providers and staff work in both the clinic and the ASC and the medical records are accessible to both. APM-H directs personnel to maintain separate time records--- one specifically for APM-SC and one technically for the ASC through one of the other APM entities to best allocate personnel costs to maximize payment from the federal government and the states of Wisconsin and Minnesota. Defendants make journal transfer revisions to the personnel time, as may be most advantageous for maximum billing.

**B. Defendants Control Physicians & Staff with a Reward/Punishment System Designed to Incentivize Scheduling and Performing Medical Procedures In-House without Regard to Medical Necessity in Accordance with Lal's Business Plan Goals.**

56.     The Advanced Pain Management entities offer pain management healthcare based on a business model that operates as a mill without regard to patient needs or medical necessity. To a large extent, whether procedures are conducted, whether durable medical devices/orthotics such

15

as back braces are dispensed, and whether drug screens or other tests or additional appointments are scheduled, depends on the set monthly goals for the number of such billing opportunities, rather than based on medical necessity.

57.     Such goals as described in the preceding paragraph are set and driven by Vishal Lal. Bonuses are awarded and reprimands issued to physicians and staff alike based upon whether the volume and value productivity goals set by Lal have been met. Such goals are expressed in terms of the number of drug screens per month, the number of back braces dispensed, and the number of medical procedures performed, particularly the lucrative implant procedures, without regard to medical necessity or patient harm.

58.     In accordance with the APM, "Management Org Structure" chart of August 8, 2012 and, in fact in practice, APM-H oversees all personnel who schedule patient appointments and procedures and who have complete authority to over-ride patient appointments for office visits and procedures made at the requests of physicians.

59.     All of the executive staff, including Relator, earned bonuses based upon meeting such goals calculated in terms of volume and revenue of the drug screens performed, back braces dispensed, and procedures conducted, particularly implant procedures.

60.     APM rewards physicians and scheduling staff for scheduling and conducting "procedures" at the APM-H ambulatory surgical centers. Such rewards are not extended to physicians when, in their medical judgment, they determine that certain "procedures" can only be safely performed in a hospital for certain frail or otherwise compromised patients.

61.     Defendants designed the APM physician and staff financial reward and discipline system to incentivize physicians to schedule patients at the APM-H ASCs even when medical

16

judgment would dictate that implant surgery without the safeguards a hospital could cause harm to certain patient-beneficiaries.

62.     APM's bonus structure for physicians is based on 1) the volume and value of new patients "converted" to procedures and 2) the volume and value of procedures performed in APM ASCs.

63.     As part of her duties during the period October 31, 2012 to February 18, 2013, Relator Hedstrom received and reviewed monthly APM reports prepared by APM Scheduling Analyst Cindy Junik, showing the number and type of procedures performed by each physician and the resulting bonus awarded to each in accordance with Vishal Lal's bonus scheme. Physicians in APM-SC also have an ownership interest in the ASCs. Each clinic has a medical director who receives a greater share of profits than those physicians who are not directors. Physician bonuses are based, in part, on Revenue Value Units "RVU", which means they are awarded bonuses based on all procedures completed at APM. The four founders receive a greater percentage. Lal's compensation, in part, is determined by whether the number of procedures scheduled reaches his revenue goal. In December or January 2013 Vishal Lal reprimanded David Bryce, M.D., a Madison APM physician, for scheduling procedures, such as implants, in hospitals rather than in the APM-H ambulatory surgical centers. Dr. Bryce had scheduled such patient procedures in hospitals because in his medical judgment the hospital facilities were necessary to avoid potential patient harm. The Chief Operating Officer, Paul Nylander met with Relator, who was APM's Director of Practice Operations, and asked her to prepare a "clinical spin" on the directive to schedule all procedures in the APM ambulatory surgical centers. The real purpose of the said directive had no clinical goal for the benefit of patients or related to medical necessity, but was set solely so APM could bill the government for the facilities component of the procedure. Nylander

17

and Hedstrom met with Dr. Bryce to counsel him regarding Vishal Lal's directed APM position that all procedures are to be scheduled and conducted in the APM ambulatory surgical centers and not a hospital.

64.     In February 2013, Relator asked Lal to eliminate the bonuses for scheduling procedures and for the labs and braces ordered through APM's ancillary department because the monetary incentive affected judgment and had an adverse effect on consideration of patient medical necessity. In response, Vishal Lal laughed and told Relator that eliminating bonuses for scheduling and performing procedures was out of the question because it would reduce the numbers of labs, braces, and procedures, and thus reduce APM profit.

65.     Defendants' business plan, implemented by its reward/punishment procedure, puts profit goals measured in volume and value above medical necessity and patient care especially when staff, who earn a bonus, tell patients to ask for a brace order before they even see a physician, when labs are required regardless of the medications the patients are taking or their history of drug use and staff are rewarded for scheduling new procedures when existing patients must delay their appointments, sometimes for many weeks beyond their physician's recommendation for a follow-up.

### C. Defendants' Business Plan Requires Filtering Appointment Software to Pull Forward Medical Procedures and Delay Returning Patient Office Visits.

66.     During the period of Relator's employment, Vishal Lal personally directed Relator to have her staff "mine" their NextGen master appointment schedule software by applying filters to pull forward all medical procedures by displacing returning patient visits so the more profitable new appointments and medical procedures could be scheduled as soon as possible. Schedulers were told to disregard the time interval directed by the patient-beneficiaries' physicians. Dr. Bryce

18

complained that his practice and his patients were being harmed due to delays in scheduling return office visits for his patients in an email directed to Nylander dated November 1, 2012. Similarly, Vishal Lal directed Relator to replace less profitable medical procedures on the master schedule with the highly lucrative surgical implants, thus causing patient harm by delaying the less profitable medical procedures for patient-beneficiaries.

67. According to the reports provided to Relator and the discussions in the weekly executive meetings, Lal's business plan for January 2013 required that 4,600 medical procedures be performed by APM physicians in the APM ASCs.

68. APM schedulers receive pay-period bonuses of a set amount if the required medical procedure level is met on a monthly basis. During Relator's employment, the full bonus amount for schedulers was about $200 per pay-period. If the goal was nearly, but not fully, met the schedulers received about a $150 bonus per pay-period.

69. Every week Vishal Lal met with Relator and two of her subordinates, Scheduling Supervisor Renee McAfee and Scheduling Analyst Cindy Junek, to review the master schedules of appointments and procedures and related pay codes for each.

70. During weekly meeting attended by Relator, the group reviewed the volume, type and revenue of procedures scheduled for the next week at all APM ambulatory surgical centers by all APM physicians to determine if the physicians were performing procedures in the ASCs in accordance with Lal's volume and revenue requirements and without regard to medical necessity. When the schedule in the ASC was not full and if procedures were instead scheduled for the hospital, Lal would order the schedulers to change the procedures' location to the ASC without consulting with the patient-beneficiaries' physician or learning whether the patient-beneficiaries had chosen the facility from which Lal directed that the procedure be moved. For specific example,

19

during Relator Hedstrom's tenure with APM, Lal ordered that procedures were moved to an APM ASC from St. Luke's South Shore Hospital, the Wausau Hospital, and a Madison hospital, all solely to maximize profit and without regard to patient harm or choice.

71.     During her APM employment, Realtor Hedstrom heard APM's Dr. Bryce complain about the fact that, without consultation with him, APM had administratively changed procedures scheduled for his patient-beneficiaries in a hospital location to an APM ASC. Dr. Bryce stated that he had chosen the hospital location due to the patient-beneficiaries' needs for the staff and resources the hospital provided and that he had discussed the choice with his patients who had elected the hospital setting for the procedure.

72.     Failure to honor the patient-beneficiary's choice of facility violates 42 U.S.C. 1395 and 42 CFR 482.43(7). Beneficiaries have guaranteed rights allowing them to utilize a provider of their choice for services offered. Lal directed that APM intentionally over-ride patient-beneficiary choice of hospital settings for their procedures.

73.     At each said weekly meeting, Lal pulled up the NextGen scheduling system on a big screen for all to view. If procedure time allowed in the clinics and ASCs was not completely filled for all physicians, he chastised everyone in the room, including Relator, who was in charge of the scheduling operation as Director of Practice Operations because more patient/beneficiaries had not been "converted" to medical procedures without regard to medical necessity or patient harm. The pressure to provide services, without regard to medical necessity or patient hard, was tremendous, including threats to staff job security, and led to performing and billing for unnecessary medical procedures.

74.     During Relator's employment with APM, Lal required a daily minimum of 200 medical procedures. If fewer than 200 medical procedures were scheduled daily, Lal became

verbally abusive and threw objects around the room. Lal, intentionally disregarded patient medical needs by requiring that patients be "converted" to various procedures solely to achieve billing and revenue requirements.

**D. Defendants' Focus on "Conversion" of New Patients to Increase Revenue from Tests, Braces, and Medical Procedures until Exhaustion of the Beneficiary's Government Benefits, Results in Patient Harm and False Claims for Medically Unnecessary Services, Facilities' Charges, and APM Waiver of Copays and Violates the AKA.**

75.     APM's over-riding policy is referred to as "conversion", which refers to getting a new patient to accept lab screens, back brace fitting and sale, and multiple medical procedures, with the ultimate focus on scheduling patients for and providing surgical implants of pumps or stimulators.

76.     During meetings with Relator and her scheduling staff, Vishal Lal would review reports on how many new patients were assigned to each physician and how many patients each physician then "converted" to a medical procedure. APM and Lal then rewarded physicians based on their "conversion rate".

77.     Such rewards to physicians included 1) monetary bonuses; 2) recognition and commendation; 3) scheduling their preferences for mid-level and support staff services and preferred time in the ambulatory surgical centers; 4) accommodating facility location preferences; and 5) assigning patient referrals, all of value to the physicians.

78.     The "conversions" include 1) bracing; 2) urine toxicology tests; and 3) any medical procedure, but particularly implants.

79.     Even for a very minor medical procedure, such as an injection that would take just five (5) minutes to administer and can be safely performed in a clinical setting, during the course of Relator's employment, Lal reprimanded physicians who did not walk the patients into the ASC side

of the facility so that the facility component charge would then be billed to the government in addition to the professional component, even when such ASC facility provided no additional medical benefit to the patient-beneficiary. Lal also reprimanded physicians who did not use APM equipment such as the C-arm, a portable imaging system, for which APM submits additional billing to the government.

80.     Realtor was present for a conversation involving Lal and Dr. Abrahams, the medical director of a new clinic with an adjoining ASC located at 959 N Mayfair Rd., Wauwatosa, WI, a joint venture with APM and the Medical College of Wisconsin. Dr. Abrahams, a Medical College physician, protested and refused to promote some of APM's practices directed by Lal to increase fraudulent billing to the government, such as performing injections in the ASC and billing the government for the ASC facilities charge, when there was no medical basis for injecting patients in the ASC. Lal also directed Dr. Abrahams to have the C-arm mobile imaging unit used and billed out more frequently, despite the fact that some of the doctors had not been trained and did not know how to operate the C-arm and despite the fact it was not needed.

81.     As a result of Dr. Abrahams' refusal to engage in billing fraud, including but not limited to utilizing and billing the government for the unnecessary use of the ASC facility and the unneeded use of the C-arm mobile imaging equipment, the Wauwatosa APM facility was the least profitable of all. Lal informed Realtor that as soon as the contract with the Medical College permits, he will replace Dr. Abrahams with an APM doctor. As set forth above, Lal exercises control over APM doctors by bonuses and discipline, thus forcing them to perform unnecessary medical procedures and bill for unnecessary equipment, lab, and facilities charges to the government.

82.     Lal tracked the number of new patients scheduled for each physician and how many new patients each physician "converted" to a procedure. During the course of Relator's

employment, when a physician convinced a patient to undergo a procedure, whether or not medically necessary, the physician was rewarded financially with an increased bonus.

83.    APM rewarded physicians with higher bonuses based on their "conversion" rate. In addition, APM rewarded high conversion rates by giving such physicians priority scheduling for ambulatory surgical center openings, thereby enabling such physicians to enhance their Medicare billing. Further, APM rewarded such high conversion rate physicians by scheduling procedures payable by Medicare for them, since such procedures did not require pre-authorization and were not as delayed as procedures payable by commercial insurance.

84.    The "mill" business plan implemented by Vishal Lal demands "conversion" of each new patient to as many procedures as possible until all financial resources and benefits of the patient have been exhausted, without regard to medical necessity or patient diagnosis.

### 1. Urine Toxicology Screens – Designated Health Services, Clinical Services

85.    Commencing in April 2012, APM ceased sending out urine specimens for drug screens and created its own in-house lab.

86.    APM then commenced a regular practice and procedure of subjecting each new patient to two urine toxicology screens, and requiring additional urine screens more frequently than the former every six (6) months standard, without regard to medical necessity.  Vishal Lal directed Hedstrom to demand that providers require drug screens before medical procedures and at appointments without regard to medical necessity and following all changes in medication even if the new medication was not a narcotic.

87.    In or about January 2013 Vishal Lal directed Relator to set up software prompts to place an alert to order a drug screen whenever a patient appointment was being scheduled that electronically blocks scheduling an appointment without the precondition of the drug screen order.

The appointment-related drug screens were in addition to the required 6-month alerts previously programmed into the APM software system. At the time Hedstrom's employment was terminated, APM's IT was in the process of implementing Lal's electronically mandated drug screen orders as a precondition to scheduling appointments.

88.     During the period of Relator's employment, APM reports studied by Relator showed that about 5,000 urine toxicology screens were performed per month in the APM on-site lab, about half of which were billed to the federal, Wisconsin or Minnesota governments.

89.     The APM toxicology lab is located on the first floor of the building that houses its corporate offices. The APM lab consists of a urine analyzer, an eye washer, and a refrigerator.

90.     The first urine screen is a drug screen single class that only reports as positive or negative whether the patient has drugs in his/her urine. The second urine analysis was sent to an outside lab and is a multiple class test reporting not only the presence of a drug but also more detailed information about the drugs found in the urine.

91.     APM billed and received payment for the single class screen from Medicare/Medicaid at $450. APM used CPT code 80101. This test is medically unnecessary based on the frequency of the orders, the lack of detail information and because more information was obtained through the second test, which APM nearly universally ordered for all patient-beneficiaries. Billing and obtaining payment for such initial screens is the sole reason APM performs the single class urine drug screens. To reach a charge of $450, APM unbundled the billing. It ran one test but billed the government as if separate tests were run for each drug, between 9 and 12 tests. APM submitted a separate charge for each drug tested.

24

92.     The multi-class drug screen is referred to as a "confirmatory" screen, performed in an outside lab, MedTox in Minnesota, during Relator's APM employment. APM used CPT code 80102. In or about January 2013, Vishal Lal directed Hedstrom to set up equipment so that APM could also perform the "confirmatory" test in house. She was told by the equipment company that it would be illegal to add the equipment for this test to APM's existing analyzer. After sharing this information with Lal, he informed Relator that APM would set up the lab for the confirmatory test on another floor so that it would be technically separate from the existing urine analyzer.

93.     At the time Relator was terminated from APM, APM was in the process of expanding its lab facilities to perform the multi-class drug screen in-house at the APM-H corporate offices, along with the initial drug screen described above.

94.     APM disincentivizes/disciplines physicians and staff who do not order excessive and medically unnecessary urine drug screens and, as described above, APM electronically blocks providers from scheduling appointments with patient-beneficiaries unless the medically unnecessary drug screens are scheduled as a pre-condition to the appointments.

### 2. Back Braces – Designated Health Services - Durable Medical Equipment

95.     APM's goal is to have every new patient receive a back brace. Nearly daily during Relator's APM employment, Vishal Lal would say: "Every new patient needs a back brace". Lal directed Hedstrom to oversee this policy directive.

96.     National clinical guidelines for the American Academy of Pain Management designate that back bracing is not effective for every patient and they are not generally recommended for patients. Lal's stated goal was for every APM patient to be prescribed a back brace.

25

97.     In addition to the brace itself, APM requires a separate appointment for measuring and fitting the brace for which APM bills Medicare and Medicaid even though the braces are already sized as small, medium, large, x-large and xx-large and do not require a fitting.   APM bills Medicare for two appointments for each brace issued to a patient---one for measuring and fitting and the other for dispensing or discussing use and care.

98.     In the month of October, 2012, for example, APM fitted and dispensed 710 LSO braces and billed the government for custom fitting for these standard, off-the-shelf braces.

99.     APM operates another entity, Advanced Bracing Plus, LLC ("Advanced Bracing").  Advanced Bracing is a shell entity with its inventory located within APM's corporate office in a large closet where it also stores other APM items  such as unused desks, artwork, and old medical records.  APM also maintains an inventory of back braces in most of its clinics.

100.     During Relator's APM employment, Vishal Lal directed that staff complete a purchase order for each brace, even though the brace was already in APM's inventory.  APM staff was required to "fax" such orders for all Medicare and Medicaid braces to "Advanced Bracing at 414-501-2359" which merely becomes an email attachment to the email account of Gabriella Bauer, APM's Facility Ancillary/Services Manager, in an attempt to make it fraudulently appear that Advanced Bracing is a separate entity, which it is not.  Advanced Bracing has no office, no staff, and no fax machine.  The web address listed for Advanced Bracing Plus also goes right to APM: apmbracing@apmhealth.com.

101.     The medical assistants, who have no medical training, receive a $15 bonus each time they convince a patient to be fitted with a back brace despite the fact that no healthcare professional first determined that a brace would be medically necessary for such patient/beneficiary

26

or in most cases had yet even seen the patient. For 710 braces per month, as in October 2012, that amounts to $10,650 per month paid out to untrained medical assistants for convincing patient-beneficiaries to be fitted with a back brace.

102.    APM's policy and practice of having staff solicit patient-beneficiaries for brace orders, including the braces ordered with faxed paperwork through ABP, constitutes solicitation of Medicare/Medicaid beneficiaries to accept a brace, prior to any provider determination of medical necessity or order for a brace.

103.    According to its Chief Operating Officer in a directive in 2012, APM's structure prohibits the four (4) founding physicians from ordering the braces themselves. These physicians have used other providers to order the braces for their patients as surrogates. Nylander instructed Hedstrom that Dr. Stauss would have another physician order braces for his patients who are fitted in clinics in which he has an ownership interest or he has the braces ordered for his patients from the shell corporation, Advanced Bracing Plus, LLC.

104.    During Relator's APM employment, Vishal Lal directed Bauer, its Facility/Ancillary Services Manager, to grow the brace program and to instruct medical assistants to fit the braces for patients without consultation with providers. Relator observed Bauer routinely coaching medical assistants about how they could increase their pay through back brace bonuses, including Bauer's directive that medical assistants "should not ask practitioners" if the patient needed a brace, but to just get the patient to buy into wanting a brace and then have the patient ask the practitioner to order a brace.

105.    To encourage mid-levels to write more drug screen and brace orders, Lal directed that their conversion rates would be a factor in their salary increases.

27

106.     Each APM site has an inventory of braces for direct distribution to patients. For Medicare patients only, during Relator's APM employment, APM required that United Parcel Service pick up the braces and deliver them to the Medicare patients' homes. Braces for Medicaid patients were dispensed to patient-beneficiaries directly at the clinic.

107.     During her APM employment, Relator asked Chief Compliance Officer Dawn Krautkramer where Advance Bracing Plus was located. Krautkramer laughed, and told Hedstrom that the braces were kept in the APM corporate offices by Gabriella Bauer, who was the Manager of Facility Ancillary Service.

108.     During Relator's APM employment, Relator observed Bauer handling and shipping the braces. Advanced Bracing Plus, LLC is operated as a division of APM, managed by Bauer, under the direct supervision of the APM Chief Compliance Officer, Dawn Krautkramer.

109.     During Relator's APM employment, Vishal Lal directed Hedstrom and Bauer to put procedures in place and to direct staff to ensure that "every new patient leaves with a back brace" or an order for home delivery of a brace in the case of Medicare beneficiaries.

110.     Hedstrom raised the barrier of medical necessity as a requirement for back braces, but Vishal Lal responded that without regard to medically necessity they were required to grow the "ancillary department" by $5 million in 2013 over 2012. Lal referred to the Advanced Pain Management Lab and Advanced Bracing Plus together as the APM "ancillary department".

111.     During Relator's APM employment, Bauer created and Dr. Bharat revised the final template for ordering braces after several initial drafts were rejected by payors. The final template created boilerplate language to justify a medical reason for bracing every new patient. The medical necessity script is prewritten in a drop-down software menu for purpose of receiving payment

without regard to actual diagnosis or medical necessity. APM directs billing providers to only use text in the drop down menu and not add anything else.

112.    During Relator's APM employment, APM's ancillary department, Advanced Bracing Plus purchased the back braces for $178 and billed them out at just under $1,000. However, APM routinely billed private pay patients at just 45% of the regularly billed cost to the government for the braces, which means that the regular rate given to the government misstates its regular rate and that APM bills the government at a substantially higher rate than it bills private insurance. This unlawful deception increases the revenue to APM and violates the AKA and FCA in violation of 42 U.S.C. § 1320a-7b(b) and 31 U.S.C. 3729(a).

113.    A Medicare patient is required to pay 20% of the brace cost, roughly $200. Frequently, when a Medicare beneficiary learns of the co-pay fee after the brace is home delivered, he/she returns the brace in lieu of payment. APM does not refund Medicare when these braces are returned. The failure to refund violates 31 U.S.C. § 3729(a)(1)(G), the "reverse false claim" provision of the statute.

114.    After the braces are returned, APM employees make them look as if they are new and APM reissues and charges again for them as new. APM bills used braces out as new (NU), rather than used (UE) even when the brace has been previously used.

115.    When APM re-uses back braces for a second Medicare/Medicaid beneficiary, APM has billed and received payment from the government for two new back braces. APM bills the government once for the brace when it is first issued and then if the patient returns it to avoid the $200 co-payment, APM bills the government a second time for the same brace after dispensing it to a different Medicare/Medicaid patient beneficiary.

29

116. Hedstrom became aware of APM's practice of issuing and billing Medicare patients for used braces as part of her managerial and supervisory duties over Bauer, one of her direct reports. Bauer spent hours repackaging braces. She used opened packaging from braces already distributed to patients in the clinic setting and then used that same packaging to repackage returned braces. The used braces were sent to different patients and billed as new. This process had taken many hours due the number of braces that had to be repackaged.

117. In an executive meeting in or about December 2013, Hedstrom alerted Vishal Lal, and Krautkramer that Medicare regulations prohibited billing of reused braces as new. She told them the practice violated the law, should stop and it was fraud. In response, APM Compliance Officer, Krautkramer, laughed at Hedstrom and told her that "spraying Febreze to get out urine smell" was all they needed to do to re-bill the same brace as new.

118. During the same meeting described in the preceding paragraph, Vishal Lal stated that APM needed to make the $5 million increase in the ancillary services and that they needed to do "whatever it takes". Lal also said "That is why I have someone with a law degree on staff so you don't have to worry about it [the law]", or words to that effect.

119. During the same meeting referenced in the preceding paragraph, Krautkramer told Hedstrom that questioning APM practice based on Medicare regulations was "outside [Hedstrom's] scope" and that Hedstrom just needed to "increase the revenue".

120. APM uses at least two PO boxes, one in Milwaukee and one in Franklin, to receive government payments for back braces and uses at least two TIN numbers. Invoices to the government for braces have been associated with the names of Advance Bracing Plus, Advanced Pain Management, Advanced Pain Management SC and Advanced Pain Management SC SC.

30

### 3. Medical Procedures

121.    APM's primary focus is to "convert" all new patient-beneficiaries to procedures, meaning to schedule all new patients for as much services generating claims to the government as possible. The pinnacle of the long list of medical procedures as stated above is an implant. There are two types of implants: drug pumps and neurostimulators. Nearly all of the APM physicians utilize only Medtronic implants without regard to medical judgment due to the relationship between Medtronic and APM.

122.    Implanted drug pumps (also called "intrathecal drug delivery systems") are surgically placed under the skin. According to the Medtronic website, surgical complications such as infection, spinal fluid leak and headache may result, causing harm to patient/beneficiaries. Once implanted, the infusion system may result in complications requiring additional surgery to correct, according to the Medtronic information. Also, drug doses may be administered improperly, resulting in "serious and even life-threatening adverse effects". Possible complications include "the catheter or pump moving within the body or wearing through the skin. The catheter could leak, tear, kink, or become disconnected."

123.    According to Medtronic's current website, neurostimulation implants are "surgically placed under the skin. Surgical complications are possible and may include infection, pain at the site of surgery, and bleeding into the epidural space. Once the neurostimulation system is implanted, device complications may occur and include corrective surgery, jolting, lead breaking, and movement of the lead within the epidural space which may require reprogramming or surgical replacement of the leads."

124.    Both types of implant surgeries are billed to the government at the rate of between $80,000 and $100,000, depending on various factors, particularly the type of implant. In addition,

31

APM submits bills to the government for implant trial surgeries, pre- and post-surgery services, maintenance of drugs and electronic wires, examination, and adjustment, as well as for the batteries and drugs.

125.    APM also implants trial stimulators. Medicaid has a payment cap on pumps, and the trial pump exhausts the benefits, so a permanent pump would never be covered. Thus, a trial pump is of little if any medical necessity. During the short time Relator was at APM, she became aware of approximately 20 patients in which APM implanted the trial use pumps, knowing their government benefits will not cover a permanent pump.

126.    Relator has personal knowledge that APM instructs its healthcare providers not to inform the patients that the payment cap will prevent APM from implanting the permanent pump. Patients who had a successful trial pump and then asked for the permanent pump were given a series of excuses about why the procedure cannot be scheduled, but were not told that APM knew from the beginning that a permanent pump was not an option. In about January 2013, Hedstrom asked Lal to put in writing his policy of not so informing the patients. Lal said he would never do that and director that Hedstrom and her staff administer the said unwritten policy.

127.    Trial pump procedures billed at about $10,000 to $15,000. APM pays $3,000 to $5,000 for a Medtronic trial pump.

128.    Permanent pump procedures are charged to the government for patient-beneficiaries at about $80,000, or about $100,000 with a rechargeable battery. APM charges its private pay patients only $40,000 for the permanent pump procedure.

129.    To further raise volume by inducing the patient-beneficiaries to consent to procedures, APM waived the Medicare co-pay to be paid by the patient-beneficiaries. APM's

32

policy and practice, without regard to ability to pay, was to waive the co-pay if a patient-beneficiary was hesitant about consenting to an implant. Payment reductions without considering financial ability to pay misstate charges in violation of 42 U.S.C. § 1320a-7b(b) and 31 U.S.C. 3729(a).

130. Patient-beneficiaries who have pump procedures often require subsequent services for which APM submitted claims for payment under Medicare and Medicaid, such as 1) adjusting leads; b) fluoroscopy-X-ray image; and 3) medication fill charges. APM billed the government for medication fill charges under the Provider names of Dr. Stauss and Physician Assistant ("PA") Greg Cavanaugh, even though RN Nancy Lassa provided the service. Cavanaugh told Relator he was worried this would be discovered, but that it was not possible for him to see the number of patients in a day that were charged out under his Provider number. During Relator's APM employment, on some days PA Cavanaugh's provider number was used for such services provided by RN Lassa, when Cavanaugh was not even at the location where the services were performed. For example, on a day when Cavanaugh was at St. Luke's South Shore, his Provider number was also used to bill for services Lassa provided at 4448 W. Loomis Road, Suite 202, Greenfield, WI 53221.

131. APM scheduled a Certified Registered Nurse Anesthetist ("CRNA") to participate in every surgery Stauss conducts on days he is performing implant surgeries and then bills out the CRNA for all of Dr. Stauss' non-implant surgeries performed the same day. CRNA's are licensed to perform a deeper level of sedation, than providers for whom the government is billed out at a significantly lower level. APM did not utilize a CRNA for surgeries on days Stauss did not perform implant surgeries. APM planned to and did fraudulently bill the government for such CRNA services that were not medically necessary.

33

132.    Patient-beneficiaries complained to Relator and those she supervised about their higher copays for the same non-implant procedures that were performed on different days. The higher co-pays resulted from billing the CRNA's medically unnecessary procedures.

133.    According to emails reviewed by Relator, Lal personally approved the special reduced pricing for private pay patients not extended to government payors. In addition, Lal routinely directed waiving co-pay fees for Medicare beneficiaries, without inquiry into ability to pay. The payment reductions violate 42 U.S.C. § 1320a-7b(b) and 31 U.S.C. 3729(a).

134.    Vishal Lal directed Relator to "do whatever it takes" increase APM revenue. While researching how to increase revenue, she discovered that since 2006, APM had more than $10Million dollars in uncollected co-pays. She suggested patients be asked to pay copays at the time of their appointments/procedures as a front office procedure. Krautkramer told her that APM did not want to collect when the patient came for the appointments as that would discourage patients from scheduling appointments or procedures. Hedstrom told Krautkramer that it was illegal to give something away to increase the number of procedures, such as to waive the co-payments.

135.    Hedstrom attempted to stop false claims and confronted Lal, stating that it was illegal to waive the copays as a regular business practice. Lal replied that it was his job to increase the number of procedures and he was not going to worry about co-pay waivers. Lal directed the waiver of co-pay fees for Medicare and Medicaid patients.

### E. APM's Business Plan requires False Claims based on Solicitation of Beneficiaries for Implants and Sharing Beneficiary HIPAA Data with Medtronic.

136.    Patrick Carnis ("Carnis") is the Medtronics Corporation ("Medtronics") sales representative to APM in the Milwaukee area for pain stimulator implants and pain drug pump implants. Dr. Stauss, one of the four (4) APM physician partners, generates approximately 20% of

34

the total APM revenue by his "mill" style of practicing medicine focused on implanting as many Medtronic electronic stimulators and drug pumps as possible, often performing surgeries in two operating rooms simultaneously, and focused on maximizing the number of related surgeries to maintain and correct the implants and to surgically address those resulting in complications. He does not see his patients before or after surgery except to perform subsequent surgeries. He often has RN Lassa perform the pre-surgery assessment.

137.     According to the information Relator learned in the course of the performance of her job duties, APM allows Dr. Stauss remote access to patient records from his lake home in Lake Geneva, Wisconsin where Stauss frequently entertains Carnis where they jointly work to identify APM patient beneficiaries to "convert" to procedures for billing to the government.

138.     APM through Dr. Stauss provided Carnis with access to confidential HIPAA protected patient beneficiary data, including contact information.

139.     Carnis attends appointments with patients to discuss the potential for a Medtronic implant. The medical charts do not have a signed HIPAA consent for Carnis to be present.

140.     Carnis gave a list including APM patient information to providers.  The patients' medical charts do not have signed HIPAA consents for Carnis to have access to their information. During the period of Relator's APM employment, APM assigned a mid-level provider to use the list to call the patients who had not yet had an implant.  The mid-level provider was instructed to call such patients and talk them into agreeing to implant surgery without regard to medical necessity.

**F. APM Falsifies Medical Records to Obtain Government Payments.**

141.     APM fraudulently up-codes to falsely indicate that a physician saw a patient for an initial visit when, in fact, a mid-level performed the service.  The visit is billed as if the physician

saw the patient for an expanded new patient visit even though the physician did not exam the patient. Relator is aware that at the Franklin location upcoding occurred when Rita Coullard APNP examined the patients and Dr. Aasen billed for the examinations. By doing, this, APM frees the physician to bill for procedures but then also bills a midlevel at the higher physician rate for expanded new patient visit.

142. When a facility opens before being credentialed, APM schedules and performs procedures on Medicaid patients, but delays billing them until after properly credentialed by Medicare. For example, the Wausau ASC falsified billing dates of Medicaid patients by 6 to 8 weeks until the Medicare credentialing was completed. Relator estimates about 300 patients were back billed.

143. APM's Compliance Officer permits APM to falsify medical record certification to obtain payment from the government sources when she refuses to require Dr. Stauss to make accurate medical record entries, to timely sign his medical records or to even read the medical records before he electronically signs them.

144. Around November of 2012, Hedstrom asked Dr. Stauss how he could keep up with the medical records entries. Dr. Stauss responded that he had a template created and put on a jump drive. He used the template to fill in the blanks such as the patient name and name of the procedure and did a lot of cutting and pasting. Hedstrom's review of his records revealed many entries had words missing, identified patients with the wrong gender, and, in some cases, the text did not make sense, all of which showed he did not review them.

145. Dr. Stauss also backdated many records. It is not uncommon for him to sign 800 patient records in a day to catch up as he only signs records every four to six weeks usually after

36

personnel in medical records ask him to get current by reviewing and signing his medical records. The number of records is high as he daily performs multiple surgeries virtually five days a week and sometimes even has two surgeries scheduled at the same time, which he accommodates by going back and forth between two operating rooms.

146. As part of her APM duties, Hedstrom investigated Stauss' patient medical record conduct. She learned that Stauss has electronically signed 1,000 patient records in a day. Hedstorm learned that APM allows Stauss remote access his patient records such as from home and before going on a vacation in the fall he had electronically signed about 300 records in a morning.

147. Around January of 2013, Dr. Stauss signed and back-dated about 850 patient records from April 2012 to the date of signing. Hedstrom learned of this from April Jasinski, supervisor of the medical records staff that Dr. Stauss had signed all the records in period of two to three hours, Hedstrom told Nylander and Krautkramer, the Chief Compliance Officer about the excessive number of records Stauss signed in the short period of time. She relayed that Stauss did not read the medical records before he electronically signed them as April Jasinksi had told her that Stauss shared that he had just clicked through the records to sign them without reading the records to verify their accuracy, which included histories, physical exams, treatment plans and procedures.

148. In response, Nylander told her that Stauss was one of the founders and that her job was to keep him happy. Krautkramer responded by telling Hedstrom that Stauss was the highest performing physician and there is nothing wrong with his signing that many records in a day and that this was not her business. Hedstrom had told Nylander and Krautkramer about the excessive number because by electronically signing the records, Stauss was backdating and certifying that the information in the records was correct and he obviously had not verified the information.

37

## G. Billing Practices Ensure Lack of Refunds, Double Billing & Higher Prices for Government Beneficiaries

149.     APM has a routine practice of billing all services at the highest level, including billing unnecessary facilities component charges by directing its physicians not to perform any procedures in the clinic space even when there is no medical reason to use the ASC instead of the adjoining clinic. If a patient has an office visit and needs a minor procedure, physicians are directed to walk the patient over to the ASC side and to perform the procedure there instead. The extra facility charge is often several thousand dollars more than if the procedure was performed in the clinic as it is sterile operating room, but this sterile environment is not needed for many injections performed there.

150.     APM's business model is that physicians bill professional fees. Then, as a separate entity, ASC bills the facility component.

151.     During Relator's APM employment, she learned of an APM practice to bill for procedures not performed. Relator's staff and colleagues brought to her attention that patients called about services that had not been provided but that were being billed to the government or other payors. Steve Shultz, APM's patient contact for billing complaints, brought to Relator's attention examples of patients who had been billed for recent procedures, even though they had not been to APM for over two years. He maintained a log of complaints. Other examples include billing a patient for a canceled visit when a patient had not fasted, or for an IV when none was used, or when the patient had waited for an hour and left without being seen. Shultz complained to Relator throughout her APM employment that APM would not allow him to refund patients when an overpayment was made. Shultz was required to make patients wait a year or so for refunds, if at all.

152. Only Lal and Krautkramer had authority to authorize a refund or to change a billing. Lal directs staff to refuse to refund patients for months and see if the patient will give up seeking a refund. Jennifer Hymes, who worked on site for the APM's billing vendor, National Billing Services, told Relator that her supervisor advised her to talk to Lal and Lal told her not to issue refunds. Lal told Hymes that he wanted to keep the refunds on the books and refunds could not be made unless he agreed. His directive caused an excessive delay in refunds and often meant no refund was made.

**H. Defendants Prepare False Schedules ---Billing by Providers for Not Only Their Work but also for Lower Level or Uncredentialed Staff Who Perform the Work---i.e., A Scheme to Collect Payments for Work Not Eligible for Billing.**

153. Defendants maintain schedules for patient visits. Each patient is assigned a staff person who is identified on the schedule for the day. The schedule was attached to the NextGen billing software. For example, a patient would be assigned to see a mid-level professional, such as a physician assistant, who signs off on the medical records and then bills for the services.

154. When a dual or triple number schedule is used, the mid-level person does not see all of the patients on the schedule assigned to him/her, but all patients assigned to that person are billed to that provider. For providers involved in APM's scheme, the schedule adds a number 1, 2 or 3, which is code to staff to whom the patient should be directed. The number 2 or 3 is code for a person who cannot legally bill.

155. For example, at the clinic located at 4448 W. Loomis Road, Suite 202, Greenfield, WI 53221, the daily schedule might identify Greg Cavanaugh, a physician assistant as seeing about 40 to 50 of the patients when he actually only saw between 20 and 30 patients. The schedule added a 1 to designate for staff those patients he would actually see. The schedule used a 2 to identify

appointments for Nancy Lassa, a RN, not qualified to bill for the patients. Her name would not appear in the schedule but staff knew to direct Cavanaugh 2s to her room.

156.    After Cavanaugh lost his credentials for a time, the schedule showed that Kaylene Frey, a physician assistant, saw 80 patients in a day when she actually only saw between 20 and 30 patients. If she was at a different clinic location, the schedule would instead show another Physician Assistant, Earl Beam ("PA Beam"), as seeing about 80 patients in a day when he actually only saw between 20 or 30 patients. The APM fraudulently billed for PA Cavanaugh at the PA level when APM knew Cavanaugh had lost his credentials. APM also fraudulently billed the government for RN Lassa's services at Physician Assistant rates as either PA Frey or PA Beam. The schedule was coded with #2 or #3 and APM staff was trained on the code so they could direct patient-beneficiaries to the replacement staff in a fraudulent conspiracy to defraud the government.

157.    PA Frey expressed to Relator her concern that an audit would show that she had not and could not have seen all the patients attributed to her in a day.

158.    To enable maximum billing as Dr. Stauss for RN Lassa's pre-surgery work-up of Dr. Stauss's potential pump implant patient-beneficiaries and his patients returning for a medication fill for their pumps, APM assigned RN Lassa her own examination room.

159.    Lassa saw patients virtually every Tuesday and would have a full schedule of 20 patients she saw, but they were billed to the government as if performed by Dr. Stauss or a Physician Assistant when RN Lassa was in fact the provider. RN Lassa was not eligible to bill the government. Based on her direct knowledge and given that charges varied with the level of care, Relator estimates that the amount Dr. Stauss and APM fraudulently billed the government for RN

Lassa's services as if Dr. Stauss had performed the work was approximately $300,000 to $500,000 annually.

160.    Other APM locations also have used code numbers on schedules to keep track of which provider is billing for the patient and which one is actually treating the patient. For example, the Green Bay location used this procedure while waiting for one of its mid-levels to be credentialed: APM coded PAs' Alexa Juzenas and Jason Davis to indicate that the one with the credentials was performing the services even when the non-credentialed PA performed the services.

**COUNT ONE**
**False Claims Act U.S.C. § 3729(a)(1)(A)[1]**
**Knowing Submission of False Claims for Payment**

161.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

162.    This is a claim by Relator, on behalf of the United States, for treble damages and penalties under the FCA, 31 U.S.C. §3729(a)(1)(A).

163.    By their fraudulent concealment, misrepresentations and submission of non-reimbursable claims described above, Defendants knowingly presented, or caused to be presented false or fraudulent claims capable of influencing the government's decision to pay, for improper payment or approval.

164.    The United States, unaware of the falsity of fraudulent nature of Defendants' claims, paid the claims.

165.    By these payments, the United States has been damaged, and continues to be

---

[1] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(1).

damaged in a substantial amount.

**COUNT TWO**
**Federal False Claims Act 31 U.S.C. §§ 3729(a)(1)(B)[2]**
**Knowing Creation of False Record or Statement Material to False Claim**

166.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

167.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

168.     By the fraudulent concealment, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim.

169.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed and may not have otherwise been submitted.

170.     By payments, the United States has been damaged, and continues to be damaged in a substantial amount.

**COUNT THREE**
**Federal False Claims Act 31 U.S.C. §3729(a)(1)(C)[3]**
**Conspiracy to Commit Violation of False Claims Act**

171.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

172.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

---

[2] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(2).

[3] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(2).

173.     By their fraudulent concealment, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and/or (a)(1)(B) and/or (a)(1)(G).

174.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed and may not have otherwise been submitted.

175.     By these payments the United States has been damaged, and continues to be damaged in a substantial amount.

**COUNT FOUR**
**Federal False Claims Act, 31 U.S.C. 3729(a)(1)(G)**
**Knowing or Improper Avoidance of Repayment of Government Funds**

176.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

177.     By their actions and inactions described above, Defendants have received funds for knowingly false claims and has failed to timely return such funds despite a legal obligation to do so once Defendants had knowledge of the fraudulent receipts, pursuant to the Federal False Claims Act, as amended, 31 U.S.C.§ 3729 (a)(1)(G).

178.     By these payments the United States has been damaged, and continues to be damaged in a substantial amount.

**COUNT FIVE**
**Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(a)**
**Knowing Submission of False Claims for Payment**

179.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

180.     This is a claim for treble damages and civil penalties under the Wisconsin False

43

Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(a).

181. By their the fraudulent concealment, misrepresentations and submissions of non- reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Wisconsin Medicaid Program and other state programs false or fraudulent claims for payment or approval.

182. The Wisconsin Medicaid Program and other state programs, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed and may not have been otherwise submitted.

183. By these payments, the Wisconsin Medicaid Program and other state programs have been damaged, and continue to be damaged in a substantial amount.

## COUNT SIX
### Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(b) Knowing Creation of False Record or Statement Material to False Claim

184. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

185. This is a claim for treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(b).

186. By the fraudulent concealment, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement, in violation of Wis. Stat. §20.931(2)(b).

187. The State of Wisconsin, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed and may not have otherwise been submitted.

44

188.     By these payments, the State of Wisconsin has been damaged, and continues to be damaged in a substantial amount.

### COUNT SEVEN
### Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(c)
### Conspiracy to Commit Violation of False Claims Act

189.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

190.     This is a claim for treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(c).

191.     Moreover by virtue of the fraudulent concealment, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of Wis. Stat. §20.931(2)(c).

192.     The State of Wisconsin, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed and may not have otherwise been submitted.

193.     By these payments the State of Wisconsin has been damaged, and continues to be damaged in a substantial amount.

### COUNT EIGHT
### Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(h)
### Knowing or Improper Avoidance of Repayment of Government Funds

194.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

195.     By their actions and inactions described above, Defendants have received funds for knowingly false claims and has failed to timely return such funds despite a legal obligation to do so once Defendants had knowledge of the fraudulent receipts, pursuant to Wisconsin False

Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(h).

196.     By these payments the State of Wisconsin has been damaged, and continues to be damaged in a substantial amount.

## COUNT NINE
### Minnesota False Claims Act Minn. Stat. § 15C.02(a)(1)
### Knowing Submission of False Claims for Payment

197.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

198.   . This is a claim for treble damages and civil penalties under the Minnesota False Claims Act Minn. Stat. §15C.02(a)(1).

199.     By the fraudulent concealment, misrepresentations and submissions· of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Minnesota Medicaid Program and other state programs false or fraudulent claims for payment or approval.

200.     The Minnesota Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed and may not have been otherwise submitted.

201.     By these payments, the Minnesota Medicaid Program and other state programs have been damaged, and continue to be damaged in a substantial amount.

## COUNT TEN
### Minnesota False Claims Act Minn. Stat. §15C.02(a)(2)
### Knowing Creation of False Record or Statement Material to False Claim

202.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

203.     This is a claim for treble damages and civil penalties under the Minnesota False

46

Claims Act Minn. Stat. § 15C.02(a)(2).

204.     By the fraudulent concealment, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement, in violation of 15C.02(a)(2).

205.     The State of Minnesota, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed and may not have otherwise been submitted.

206.     By these payments, the State of Minnesota has been damaged, and continues to be damaged in a substantial amount.

**COUNT ELEVEN**
**Minnesota False Claims Act Minn. Stat. §15C.02(a)(3)**
**Conspiracy to Commit Violation of False Claims Act**

207.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

208.     This is a claim for treble damages and civil penalties under the Minnesota False Claims Act Minn. Stat. §15C.02(a)(3).

209.     By the fraudulent concealment, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of Minnesota False Claims Act Minn. Stat. §15C.02(a)(3).

210.     The State of Minnesota, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed and may not have otherwise been submitted.

211.     By these payments the State of Minnesota has been damaged, and continues to be

damaged in a substantial amount.

## COUNT TWELVE
### Minnesota False Claims Act Minn. Stat. §15C.02(a)(4)
### Knowing or Improper Avoidance of Repayment of Government Funds

212.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

213.     By their actions and inactions described above, Defendants have received funds for knowingly false claims and has failed to timely return such funds despite a legal obligation to do so once Defendants had knowledge of the fraudulent receipts, pursuant to Minnesota False Claims Act Minn. Stat. §15C.02(a)(4).

214.     By these payments the State of Minnesota has been damaged, and continues to be damaged in a substantial amount.

## COUNT THIRTEEN
### Retaliatory Wrongful Discharge Pursuant To 31 U.S.C. § 3730(h) and Wis. Stat. §20.931(14), and Minn. Stat. § 15C.14.

215.     Relator re-alleges and incorporates by reference all previous paragraphs.

216.     Through the acts of the Defendants described above, APM discharged Hedstrom because of her covered conduct of opposing Defendants' fraudulent conduct.

217.     As a result of Defendants' conduct, Hedstrom suffered damages and is entitled to relief pursuant to 31 U.S.C. §3730(h), Wis. Stat. §20.931(14), and Minn. Stat § 15C.14, including, but not limited to, reinstatement with the same seniority status Hedstrom would have had but for the discrimination, two (2) times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable actual attorneys' fees.

## COUNT FOURTEEN
### Retaliatory Wrongful Discharge Pursuant To Wisconsin Common Law and Wis. Stat. § 146.997.

218.    Relator re-alleges and incorporates by reference all previous paragraphs.

219.    Through the acts of the Defendants described above, APM discharged Hedstrom because of her covered conduct of opposing Defendants' fraudulent conduct.

220.    As a result of Defendants' conduct, Hedstrom suffered damages and is entitled to relief pursuant to Wisconsin common law and Wis. Stat. §146.997 including, but not limited to, reinstatement with the same seniority status Hedstrom would have had but for the discrimination, two (2) times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable actual attorneys' fees.


## COUNT FIFTEEN
### Violation of Anti-Kickback Statute by Offering, Paying, Soliciting or Receiving Something of Value to Induce or Reward Referrals

221.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

222.    The AKS, 42 U.S.C. § 1320a-7b(b), that arose out of Congressional concern that providers were more likely to refer patient-beneficiaries for medically unnecessary services when they were given a financial incentive to do so, created a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization of hospital services or poor quality of care.  The AKS extends to Medicaid and makes it illegal to knowingly and willfully offer or pay any remuneration to induce such person (i) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (ii) to

49

purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any goods, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(2).

223.     A claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the FCA. 42 U.S.C. § 1320a7b(g).

224.     No "safe harbors" insulate Defendants from the reach of the AKS based on the financial arrangement described herein. Defendants have the burden to prove that a safe harbor applies to its conduct.

225.     Defendants through the practices described above have intentionally violated the AKS, 42 U.S.C. § 1320a-7b(b) by offering, paying, soliciting or receiving something of value to induce or reward referrals.

## COUNT SIXTEEN
### Violation of Anti-Kickback Statute by Offering, Paying, Soliciting or Receiving Something of Value to Generate Federal Health Care Program Business

226.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

227.     Defendants through the practices described above have intentionally violated the AKS, 42 U.S.C. § 1320a-7b(b) by offering, paying, soliciting or receiving something of value to generate Federal health care program business.

## COUNT SEVENTEEN
### Violation of Anti-Kickback Statute by Routinely Waiving Co-Pays for Medicare and Medicaid Services Without Making an Individual Ability to Pay Determination

228.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

229.     Defendants through the practices described above have intentionally violated the

Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) by routinely waiving co-pays for Medicare and Medicaid services without making an individual ability to pay determination.

## COUNT EIGHTEEN
### Violations of the Stark Law by Making Referrals to Entities with which the Physicians and Advanced Pain Management, S.C. have a Financial Relationship

230.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

231.    Statute 42 U.S.C. § 1395nn, commonly referred to as the "Stark II" statute, and its associated regulations, 42 C.F.R. § 350 et seq. (collectively, "Stark"), provide that if a physician has a "financial relationship" with an entity, the physician may not make a referral to the entity for the provision of "designated health services," unless the relationship satisfies the requirements of an exception set forth in Stark.

232.    Prior to its passage, studies had shown that when physicians had financial relationships with hospitals, they referred more patients to these hospitals than they otherwise would have. 66 Fed. Reg. 856, 859 (Jan 4, 2001).

233.    Stark further provides that an entity may not present or cause to be presented to Medicare a claim for "designated health services" furnished pursuant to a prohibited referral. In addition, Medicare is prohibited from making payment on any such claim. Clinical laboratory services, durable medical equipment and orthotics are "designated health services" under Stark.

234.    Compliance with Stark is also a material condition of payment of a Medicare or Medicaid claim. See 42 U.S.C. § 1395nn(g)(1) (prohibiting payment for designated health services provided in violation of Stark). A violation of Stark gives rise to False Claims Act liability.

235.    The provisions of Stark have been extended to Medicaid pursuant to 42 U.S.C. § 1396b(s).

236.    Under Stark, a "financial relationship" consists of an "ownership or investment interest" or a "compensation arrangement." A "compensation arrangement" is any arrangement involving any remuneration between a physician (or immediate family member of such physician) and an entity, subject to certain exclusions. 42 U.S.C. § 1395nn(h)(1)(A). "Remuneration" includes any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind, subject to certain exclusions. 42 U.S.C. § 1395nn(h)(1)(B); 42 C.F.R. § 411.351.

237.    Defendants, through the practices described above, have intentionally violated Stark, 42 U.S.C. § 1395nn by Advanced Pain Management S.C. making referrals of Medicare and Medicaid patients for designated health services to Advanced Pain Management Holdings, Inc. and its affiliated shell companies, Advancing Bracing Plus and Advanced Pain Management Lab, entities with which the physicians and Advanced Pain Management, S.C. have a financial relationship.

**COUNT NINETEEN**
**Violations of the Stark Law by Submitting Claims to Medicare and Medicaid for Those Services Resulting from Prohibited Referrals of Designated Health Services From a Physician**

238.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

239.    Defendants through the practices described above have intentionally violated Stark, 42 U.S.C. § 1395nn by submitting claims to Medicare and Medicaid for those services resulting from prohibited referrals of designated health services from a physician.

**PRAYER FOR RELIEF**

WHEREFORE, the United States is entitled to damages from Defendants in accordance with the provisions of 31 U.S.C. §§ 3729-3733, as amended, Minn. Stat. § 15C.01 et seq., and

Wis. Stat. § 20.931 of which up to thirty percent (30%) should be paid to the *qui tam* plaintiff, Gina Hedstrom, and such further relief as this Court may deem appropriate or proper.

AND WHEREFORE, Plaintiff/Relator requests that judgment be entered against Defendants, ordering that:

a. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*, Wis. Stat. § 20.931, and Minn. Stat. § 15C.01 *et seq.*;

b. Defendants pay an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty against defendants of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 and not less than $5,000 and not more than $10,000 for each violation of Wis. Stat. § 20.931 and not less than $5,500 and not more than $11,000 for each violation of Minn. Stat. § 15C.01 *et seq.*;

c. Plaintiff/Relator be awarded the maximum amount allowed pursuant to, 31 U.S.C. § 3729 *et seq.*, Wis. Stat. § 20.931, and Minn. Stat. § 15C.01 *et seq.* as *qui tam* Plaintiff;

d. Plaintiff/Relator be awarded a make whole remedy pursuant to the mandates of 31 U.S.C. § 3730(h) and Wis. Stat. §20.931(14), and Minn. Stat. § 15C.14 including payment of attorneys' fees, expenses and costs;

e. Plaintiff/Relator be awarded a make whole remedy pursuant to Wisconsin common law and Wis. Stat. §146.997 for unlawful retaliatory discharge;

f. Plaintiff/Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d);

g. Plaintiff/Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to Wis. Stat. §20.931(2)(a);

h. Plaintiff/Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to Minn. Stat. § 15C.01 *et seq.*; and

i. The State of Wisconsin, State of Minnesota, and United States and Plaintiff/Relator be granted all such other relief as the Court deems just and proper.

**PLEASE TAKE NOTICE THAT THE PLAINTIFF/RELATOR DEMANDS THE ABOVE ENTITLED ACTION TO BE TRIED TO A 12-PERSON JURY.**

Dated this 30ᵗʰ day of October , 2013.

**CROSS LAW FIRM, S.C.**
**Attorneys for Plaintiff**

By. _____
Nola J. Hitchcock Cross
State Bar No. 1015817
Mary C. Flanner
State Bar No. 1013095
Katherine Gaumond
State Bar No. 1088722

Cross Law Firm, S.C.
The Lawyers Building
845 N. 11ᵗʰ Street
Milwaukee, WI 53233
(414) 224-0000
njhcross@crosslawfirm.com
mflanner@crosslawfirm.com
kgaumond@crosslawfirm.com
www.crosslawfirm.com